## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA,**

**v.**

**MICHAEL CLARK, et al.,**

**Defendants.**

**Criminal No. 16-565 (ADC)**

## OPINION AND ORDER

### I.    Introduction and procedural history

By an Indictment, dated September 8, 2016, a federal Grand Jury has charged defendants Michael Clark, Cedrick Walton, David Mallard Thomas, and John Benn with conspiracy to possess marihuana with intent to distribute on board a vessel without nationality, 46 U.S.C. §§ 70503(a)(1), 70506(b); and possession of marihuana with intent to distribute on board a vessel without nationality, 46 U.S.C. § 70503(a)(1) and 18 U.S.C. § 2. **ECF No. 16**.  These charges, under the Maritime Drug Law Enforcement Act ("MDLEA"), stem from the more than one thousand kilograms of marihuana that the U.S. Coast Guard allegedly recovered from a vessel found in international waters about forty-four nautical miles off the coast of Isla La Blanquilla, Venezuela. **ECF No. 1-1**, ¶¶ 4, 9.  All four defendants were also found on the vessel.  *Id*., ¶ 10.  The vessel "display[ed] no indicia of nationality," and defendants' conflicting oral claims about the vessel's nationality could be "neither confirm[ed] nor den[ied]" by the nations invoked.  *Id*., ¶¶ 5-6, 8.  Defendants, who are all foreign nationals, *id*., ¶ 6, have pleaded not guilty to the charges.

### A.    Defendants' motions to dismiss the Indictment are untimely

On January 20, 2017, Clark filed an untimely motion to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(1).  **ECF No. 38**.  The next day, Walton, Thomas and Benn also filed an untimely motion to dismiss.  **ECF No. 39**.  The motions are untimely because the Court had set, on November 1, 2016, a motion deadline of December 9, 2016.  **ECF No. 35**.  Although Walton, Thomas and Benn asked the Court to extend the deadline to December 29, 2016, **ECF No. 36**, and then to January 20, 2017, **ECF No. 37**, the Court did not grant the requests.  **ECF No. 40**.  Meanwhile, Clark did not request a deadline extension.  Thus, both motions were approximately six weeks late.  Even if the Court had granted Walton, Thomas and Benn their extension requests, their motion was still a day late.  Accordingly, the Court deems both motions untimely pursuant to Federal Rule of Criminal Procedure 12(c)(3).  "And a court cannot consider an untimely claim unless 'the party shows good cause.'"  *United States* v. *Ponzo*, 853 F.3d 558, 574 (1st Cir. 2017) (quoting Fed. R. Crim. P. 12(c)(3)).

### B.    Defendants show 'good cause' to consider their late motions

Although defendants do not expressly invoke the good-cause exception to the lateness of their constitutional claims under Rule 12(c)(3), they note that "neither the Supreme Court nor the First Circuit Court of Appeals have squarely addressed the constitutionality of the MDLEA's jurisdictional component under Article I of the United States Constitution."  **ECF No. 38** at 4.  Defendants also observe that, because of the failure of others to "properly preserve the issue," the Court of Appeals has, thus far, "avoided or applied plain error review to the constitutional

question." *Id*.  Because the claims that defendants are raising have become commonplace in the

MDLEA prosecutions in this District, the Court finds that they have shown good cause for the

Court to consider them.  It appears that, aside from an unreported decision by the undersigned,

*see United States* v. *Balbuena-Peguero*, No. 16-CR-656, 2017 WL 1399696 (D.P.R. Apr. 18, 2017), this

Court has not yet upheld the constitutionality of the MDLEA pursuant to the Offences Clause

in Article I, Section 8, Clause 10 of the Constitution.  But, as will be seen, the MDLEA is readily

affirmed as a proper exercise of Congress's express power, under the Offences Clause, "[t]o

define and punish . . . Offences against the Law of Nations."  *See* U.S. Const. art. I, § 8, cl. 10.

Due to a substantial overlap in the content of defendants' motions, the Court will address

each claim as though it was jointly raised.  In essence, defendants contend that this prosecution

under 46 U.S.C. § 70503(a)(1), a provision of the MDLEA, must be dismissed because the statute,

as applied to vessels without nationality in international waters, contravenes international law,

Congress's Article I powers, and due process.  Those claims are unavailing.

## II.    Legal standards governing the legality of the MDLEA under international law

"The MDLEA makes it unlawful for an individual to 'knowingly or intentionally

manufacture or distribute, or possess with intent to manufacture or distribute, a controlled

substance on board . . . a vessel of the United States or a vessel subject to the jurisdiction of the

United States.'"  *United States* v. *Nueci-Peña*, 711 F.3d 191, 197 (1st Cir. 2013) (ellipsis in original)

(quoting 46 U.S.C. §70503(a)(1)).  "That prohibition 'applies even though the act is committed

outside the territorial jurisdiction of the United States.'"  *Id*. (quoting 46 U.S.C. § 70503(b)).  "A

vessel 'subject to the jurisdiction of the United States' includes 'a vessel without nationality.'"

*Id*. (quoting 46 U.S.C. § 70502(c)(1)(A)).  "'A vessel without nationality' in turn is defined, as

relevant here, as 'a vessel aboard which the master or individual in charge makes a claim of

registry and for which the claimed nation of registry does not affirmatively and unequivocally

assert that the vessel is of its nationality.'"  *Id*. (quoting 46 U.S.C. § 70502(d)(1)(C)).

### A.    The MDLEA definition of 'vessel without nationality' and international law

The definition of 'vessel without nationality' under the MDLEA "does not conflict with

international law."  *United States* v. *Matos-Luchi*, 627 F.3d 1, 6 (1st Cir. 2010).  In fact, the MDLEA

definition is "consistent with" the definition, under international law, of a 'stateless vessel.'  *Id*.

at 6-7.  Both definitions are "designed prudentially" and "informed by the need for effective

enforcement."  *Id*. at 6.  Under both definitions, "a vessel may be deemed 'stateless,' and subject

to the enforcement jurisdiction of any nation on the scene, if it fails to display or carry insignia

of nationality and seeks to avoid national identification."  *Id*.  Both the MDLEA and international

law allow a vessel to "make an oral claim of nationality," but the vessel "'must . . . be in a position

to provide evidence of it'" because, to be valid, an "affirmative" claim of nationality must also

be "sustainable."[1]  *Id*. (quoting Anderson, *Jurisdiction over Stateless Vessels on the High Seas: An

Appraisal under Domestic and International Law*, 13 J. Mar. L. & Com. 323, 341 (1982)).  Accordingly,

under the MDLEA and international law, a boat is "without nationality" if it does not "fly a flag

---

[1] It would hardly be prudent or reasonable if a flagless boat's master could orally invoke the nationality of a small nation halfway around the world, without any evidentiary support, and if law enforcement would then have to wait for an unequivocal denial of nationality from the nation before deeming the boat stateless.

or carry registry papers," and if its oral "claim of nationality is . . . rejected or not backed up by the nation invoked." *Id*. (citing 46 U.S.C. § 70502(d)(1)(A), (C)); *see also United States* v. *Victoria*, 876 F.2d 1009, 1010 (1st Cir. 1989) (holding that a boat, sixty miles off the coast of Colombia, that "had no flag or any other indications of nationality" was "a 'stateless' vessel" under the MDLEA and international law because it had "no evidence of its nationality on board.").[2]

### B.    U.S. jurisdiction over 'vessels without nationality' and international law

Once a vessel is deemed 'stateless,' the United States may "exercise criminal jurisdiction" over it "pursuant to the Law of Nations and [the MDLEA]." *United States* v. *Cuevas-Esquivel*, 905 F.2d 510, 514 (1st Cir. 1990); *see also Victoria*, 876 F.2d at 1010 (holding that "the United States, as a matter of international law, may prosecute drug offenders on stateless ships found on the high seas" because "international law . . . gives the 'United States . . . authority to treat stateless vessels as if they were its own.'") (final ellipsis in original) (quoting *United States* v. *Smith*, 680 F.2d 255, 258 (1st Cir. 1982)).  Indeed, "international law permits any nation to subject stateless vessels on the high seas to its jurisdiction . . . *solely* as a consequence of the vessel's status as stateless" because "a ship without a nationality, or unwilling to claim one, has no right of navigation by international law." *Victoria*, 876 F.2d at 1011 (ellipsis and emphasis in original) (quoting *United States* v. *Marino-García*, 679 F.2d 1373, 1382-83 (11th Cir. 1982); then quoting Shearer, *Problems of*

---

[2] When *United States* v. *Victoria*, 876 F.2d 1009 (1st Cir. 1989) was decided, the MDLEA was codified in a different section of Title 46 and had not yet been moved to its current section.  *United States* v. *Matos-Luchi*, 627 F.3d 1, 3 (1st Cir. 2010) (recounting that the MDLEA was "initially enacted in 1986 as 46 U.S.C. app. § 1903, and later relocated to its present code sections, 46 U.S.C. §§ 70501-70507.") (internal citations omitted).

*Jurisdiction and Law Enforcement against Delinquent Vessels*, 35 Int'l & Comp. L. Q. 320, 336 (1986)). "Vessels without nationality are international pariahs" because they "are frequently not subject to the laws of a flag-state." *Marino-García*, 679 F.2d at 1382. "As such, they represent 'floating sanctuaries from authority' and constitute a potential threat to the order and stability of navigation on the high seas." *Id*. (citing H. Meyers, The Nationality of Ships 318 (1967); then citing M. McDougal & W. Burke, The Public Order of the Oceans 1084 (1962)).

For those reasons, "the assertion of jurisdiction over stateless vessels on the high seas in no way transgresses recognized principles of international law . . . nor results in impermissible interference with another sovereign nation's affairs." *Id*. at 1382-83. Also, "there need not be proof of a nexus between the stateless vessel and the country seeking to effectuate jurisdiction" because "[j]urisdiction exists solely as a consequence of the vessel's status as stateless." *Id*. at 1383. "Such status makes the vessel subject to action by all nations proscribing certain activities aboard stateless vessels and subjects those persons aboard to prosecution for violating the proscriptions." *Id*.; *see also Victoria*, 876 F.2d at 1011 (the First Circuit Court of Appeals declaring that it "agree[s] with" the "reasoning" of *Marino-García*).

Because any nation may exercise criminal jurisdiction over stateless vessels pursuant to international law, it is unremarkable that "[t]he MDLEA does not require a nexus between a defendant's conduct and the United States." *See Nueci-Peña*, 711 F.3d at 197 (citing 46 U.S.C. § 70502(c)). Similarly, the Define and Punish Clause, which is the constitutional provision under which Congress enacted the MDLEA, "does not explicitly require a nexus between the unlawful

conduct [prohibited] and the United States be established before Congress can punish that conduct." *Id*. at 198 (citing U.S. Const. art. I, § 8, cl. 10); *see also Smith*, 680 F.2d at 257 ("Congress exercises jurisdiction over offenses committed beyond the territorial boundaries of the United States pursuant to Article I, Section 8, Clause 10 of the Constitution, which authorizes Congress 'to define and punish Piracies and Felonies committed on the high Seas, and offences against the Law of Nations.'"); **ECF Nos. 38** at 3 (Clark recognizing that Congress enacted the MDLEA pursuant to the Define and Punish Clause); **39** at 6 (same as to the other three defendants).

### III.    Discussion of the legality of the MDLEA under international law

#### A.    MDLEA prosecution of Defendants is consistent with international law

The Court finds that the MDLEA, as applied to defendants, complies with international law.  As defendants stipulate for purposes of their motions, the U.S. Coast Guard apprehended them in international waters about forty-four miles off the coast of Venezuela.  **ECF Nos. 38** at 1-2, **39** at 1, 3.  Their vessel displayed "no indicia of nationality," and the Government of Jamaica "could neither confirm nor deny" the oral claim about the vessel's Jamaican nationality made by Clark, its master.  **ECF No. 38** at 2; *see also* **ECF No. 39** at 2.[3]  Based on those facts, the Coast Guard properly found that the vessel was "without nationality" under 46 U.S.C. § 70502(d).  *See*

---

[3] It appears that Clark's oral claim was equivocal.  The record shows that he made both "a verbal claim of Jamaican nationality for the vessel" and "a verbal claim of Dominican Republic nationality for the vessel." **ECF No. 1-1**, ¶¶ 6, 8.  Clark "vehemently denies" having made the latter claim.  **ECF No. 38** at 2 n.3.  But if he did claim both nationalities for the boat, it would have thereby been assimilated to a vessel without nationality, enjoying "no legal protection" whatsoever.  *United States* v. *Matos-Luchi*, 627 F.3d 1, 5 (1st Cir. 2010) (citing 1 L. Oppenheim, International Law § 261, at 595-96 (H. Lauterpacht ed., 8th ed. 1955)).  In any event, the record shows that "the Dominican Republic could neither confirm nor deny registry of the [boat]." **ECF No. 1-1**, ¶ 8.

*Matos-Luchi*, 627 F.3d at 6; *Victoria*, 876 F.2d at 1010; *see also* **ECF No. 39** at 2.  And, the prosecution of individuals found on stateless boats in international waters complies fully with international law.  *Victoria*, 876 F.2d at 1010-11; *Marino-García*, 679 F.2d at 1382-83.  Furthermore, "application of the MDLEA to the defendants is consistent with the protective principle of international law because Congress has determined that all drug trafficking aboard vessels threatens our nation's security."  *United States* v. *Cardales*, 168 F.3d 548, 553 (1st Cir. 1999) (citing *United States* v. *Martínez-Hidalgo*, 993 F.2d 1052, 1056 (3rd Cir. 1993)); *see also* 46 U.S.C. § 70501(1) ("Congress finds and declares that trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States.").  Accordingly, the Court rejects the claim that this prosecution contravenes international law.[4]  *See* **ECF Nos. 38** at 3-4, 18; **39** at 5.

> **B.**    **The MDLEA definition of 'vessel without nationality' comports with the international-law definition of 'stateless vessel'**

Defendants assert that "the MDLEA's definition of 'vessel without nationality' extends far beyond what international custom or convention recognizes as statelessness."  **ECF Nos. 38** at 12; **39** at 14.  However, as explained above, the law of this Circuit holds otherwise.  *See Matos-Luchi*, 627 F.3d at 6-7.  To support their assertion, defendants misleadingly cite to the dissenting

---

[4] Defendants assert, without citation to authority or legal analysis, that the prosecution is also defective because the U.S. Coast Guard "illegally detained" them in international waters "without a plain view of bags with possible contraband."  **ECF No. 39** at 3.  However, defendants ignore that their vessel was stateless and, thus, the Coast Guard properly exercised jurisdiction over it.  And, insofar as defendants seek to argue that they were seized without probable cause, "the Fourth Amendment does not apply to activities of the United States against aliens in international waters."  *United States* v. *Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008).

opinion in *United States* v. *Trinidad*, 839 F.3d 112 (1st Cir. 2016), without indicating that they are citing the dissent as opposed to the Opinion of the Court.  *See* **ECF Nos. 38** at 12-13; **39** at 5.  That practice is both unacceptable and inexcusable.  Defendants cite the dissent in such a way as to make it appear as though the First Circuit Court of Appeals has held that the MDLEA oversteps jurisdictional boundaries and exceeds Congress's powers.  *See* **ECF Nos. 38** at 13; **39** at 5.  As defendants know quite well, however, that dissent does not state the law of this Circuit.

In any event, if the MDLEA happens to conflict with international law, "defendants are not entitled to raise a violation of international law as an objection."  *Matos-Luchi*, 627 F.3d at 6 (citing 46 U.S.C. § 70505).  Thus, attacks on the MDLEA definition of statelessness are unavailing.

## C.    International law does not independently limit the powers of Congress

Even if the MDLEA conflicted with international law, it would not affect the MDLEA's validity for domestic purposes because international law does not independently constrain the constitutional powers of Congress.  Principles of international law do not limit Congress unless those principles are "accept[ed]" and self-imposed "by the United States."  *Lauritzen* v. *Larsen*, 345 U.S. 571, 578 (1953) (quoting *Farrell* v. *United States*, 336 U.S. 511, 517 (1949)).  That is the reason why the canon of construction admonishing courts "that 'an act of congress ought never to be construed to violate the law of nations if any other possible construction remains'" is just that – a mere presumption of statutory interpretation – and "not, as sometimes is implied, any impairment of our own sovereignty, or limitation of the power of Congress."  *Id*. (quoting *The Charming Betsy*, 6 U.S. 64, 118 (1804)); *see also United States* v. *Ballestas*, 795 F.3d 138, 144 (D.C. Cir.

2015) (holding that "[t]he so-called *Charming Betsy* canon . . . 'represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate.'") (quoting *Morrison* v. *Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)).

When a statute makes plain Congress's intent, as the MDLEA certainly does, *see* 46 U.S.C. §§ 70503(b), 70505, the Court "must enforce the intent of Congress irrespective of whether the statute conforms to . . . international law." *Ballestas*, 795 F.3d at 144 (quoting *United States* v. *Yousef*, 327 F.3d 56, 93 (2d Cir. 2003)) (upholding as constitutional the application of the MDLEA to a Colombian national charged with conspiracy to distribute cocaine based on ships seized in international and foreign-territorial waters). "After all, 'Congress is not bound by international law,' so 'it may legislate with respect to conduct outside the United States, in excess of the limits posed by international law.'" *Id*. (quoting *Yousef*, 327 F.3d at 86); *see also Olivia* v. *United States DOJ*, 433 F.3d 229, 236 (2d Cir. 2005) ("Never does customary international law prevail over a contrary federal statute.") (quoting *TMR Energy Ltd.* V. *State Prop. Fund of Ukr.*, 411 F.3d 296, 302 (D.C. Cir. 2005)). Thus, although the Court has found that the MDLEA is fully consistent with international law, *see United States* v. *Bravo*, 489 F.3d 1, 7 (1st Cir. 2007), a contrary finding would not have threatened the validity of the statute. Indeed, a contrary finding would not divest the Court of jurisdiction, nor constitute a defense to prosecution. *See Matos-Luchi*, 627 F.3d at 6.

## IV.    Legal standards governing Congress's Article I power to enact the MDLEA

Defendants recognize that "Congress enacted the MDLEA under its power to 'define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of

Nations.'" **ECF Nos. 38** at 3 (quoting U.S. Const. art. I, § 8, cl. 10 ("Define and Punish Clause"));

**39** at 6 (same); *see also Smith*, 680 F.2d at 257.  The Define and Punish Clause empowers Congress

to define and punish three separate categories of crime: 1) piracies, 2) felonies committed on the

high seas, and 3) offenses against the law of nations.  *See United States* v. *Smith*, 18 U.S. 153, 158-

59 (1820).  The first two grants of power are known as the Piracies and Felonies Clause, whereas

the third and final grant of power is called the Offences Clause.  *See, e.g., United States* v. *Bellaizac-*

*Hurtado*, 700 F.3d 1245, 1249, 1257 (11th Cir. 2012) (employing that terminology).

Although several courts have evaluated the constitutionality of the MDLEA under the

Piracies and Felonies Clause, *see, e.g., Nueci-Peña*, 711 F.3d at 196-198 (affirming constitutionality

of MDLEA under Piracies and Felonies Clause on plain-error review), the Court will express no

opinion on the matter.  It is a "settled rule" of judicial decision-making "to decide no more than

is necessary to the case in hand."  *Elgin Nat'l Watch Co.* v. *Illinois Watch Case Co.*, 179 U.S. 665,

670 (1901).  And, as will be seen, it is clear that Congress properly enacted the MDLEA pursuant

to the Offences Clause.  *See, e.g.,* Sarah H. Cleveland & William S. Dodge, *Defining and Punishing*

*Offenses Under Treaties*, 124 Yale L. J. 2202, 2273-75 (2015) (hereinafter, "Cleveland & Dodge").

Thus, the Court will limit its discussion of the statute's constitutionality accordingly.

### A.    Introduction to the Offences Clause

In our federal system, "the Government of the United States has been vested exclusively

with the power of representing the nation in all its intercourse with foreign countries."  *United*

*States* v. *Arjona*, 120 U.S. 479, 483 (1887).  "It alone can 'regulate commerce with foreign nations,'

[and] make treaties and appoint ambassadors and other public ministers and consuls." *Id*. (quoting U.S. Const. art. I, § 8, cl. 3; then citing U.S. Const. art. II, § 2, cl. 2). By contrast, "[a] state is expressly prohibited from entering into any 'treaty, alliance, or confederation.'" *Id*. (quoting U.S. Const. art. I, § 10, cl. 1). "Thus all official intercourse between a state and foreign nations is prevented, and exclusive authority for that purpose [is] given to the United States." *Id*.

"The national government is in this way made responsible to foreign nations for all violations by the United States of their international obligations, and because of this, Congress is expressly authorized 'to define and punish . . . offences against the law of nations.'" *Id*. (quoting U.S. Const. art. I, § 8, cl. 10); *see also Boos* v. *Barry*, 485 U.S. 312, 323 (1988) (stating that the Offences Clause "attempts to further" the "vital national interest" of the United States "in complying with international law."). To that end, the Supreme Court, in construing the Offences Clause, has held that "if the thing made punishable is one which the United States are required by their international obligations to use due diligence to prevent, it is an offence against the law of nations." *Arjona*, 120 U.S. at 488.

**B.**     **Treaties as part of the 'Law of Nations' for purposes of the Offences Clause**

Treaties are a traditional source of legal obligation under international law. Restatement (Third) of Foreign Relations Law § 102(3) ("International agreements create law for the states parties thereto."). At the time of the Founding (as well as for decades before and after), the plain meaning of the term "Law of Nations" included treaty obligations, which were also known as the "conventional law of nations." *See Thirty Hogsheads of Sugar* v. *Boyle*, 13 U.S. 191, 198 (1815)

(per Marshall, C.J.) ("The law of nations . . . is in part unwritten, and in part conventional."); *The Venus*, 12 U.S. 253, 283 (1814) (per Washington, J.) (equating the "conventional law of nations" with "treaties"); *Ware* v. *Hylton*, 3 U.S. 199, 227 (1796) (per Chase, J.) ("The law of nations may be considered of three kinds, to wit, general, conventional, or customary. . . . The second is founded on express con[s]ent, and is not universal, and only binds those nations that have assented to it."); *see also* Cleveland & Dodge, 124 Yale L. J. at 2212 ("The two authorities that the founding generation consulted most frequently – Emmerich de Vattel's Law of Nations and William Blackstone's Commentaries on the Laws of England – both used 'law of nations' in this comprehensive sense" of including treaties within its scope.).

Citing an array of primary sources, Professors Cleveland and Dodge persuasively show that "the general understanding of the 'law of nations,' from at least the publication of Vattel's The Law of Nations in 1758 until well into the nineteenth century, embraced all forms of international law, including treaties." *Id*. at 2215-16. Thus, under *Arjona*, the Offences Clause empowers Congress to define and punish offenses that proper treaty obligations require the United States to use due diligence to prevent. 120 U.S. at 488; *see also Bond* v. *United States*, 134 S. Ct. 2077, 2103-11 (2014) (Thomas, J., concurring) (indicating that the Treaty Power is a federal power that is limited to matters of legitimate international intercourse); *United States* v. *Angulo-Hernández*, 565 F.3d 2, 4 (1st Cir. 2009) (noting that Congress enacted the MDLEA in response to "the 'serious international problem' of maritime drug smuggling.") (quoting 46 U.S.C. § 70501).

"To be sure, members of the founding generation occasionally used 'law of nations' to refer to the unwritten law of nations," *i.e.*, customary international law, "in contradistinction to treaties, when both terms were employed together."  Cleveland & Dodge, 124 Yale L. J. at 2216. This secondary usage "seems to have been common when people referred to treaties expressly and needed a catch-all phrase to refer to the other categories of the law of nations."  *Id*.  "So they used the general phrase 'law of nations,' which would encompass both the 'customary' and the 'voluntary' law of nations, despite this phrase's redundancy with respect to the 'conventional' law of nations – that is, treaties."[5]  *Id*.  Thus, when the Alien Tort Statute (1789) "refers separately to both 'the law of nations [and] a treaty of the United States,'" it is deploying the term 'the law of nations' in its secondary, narrower sense.  *Id*. (alteration in original) (quoting 1 Stat. 73, 76-77 (1789), codified at 28 U.S.C. § 1350).  That is why courts, in "the context of the [Alien Tort Statute] . . . have consistently used the term 'customary international law' as a synonym for the term 'law of nations.'"  *Flores* v. *S. Peru Copper Corp.*, 414 F.3d 233, 237 n.2 (2d Cir. 2003).  By contrast, "the general understanding of the 'law of nations' at the Constitution's adoption," including as the term was deployed in the Offences Clause, "was that it included all international law – the

_____

[5] These terms come from Emmerich de Vattel's treatise The Law of Nations.  According to de Vattel, the "voluntary" law of nations was one of the four categories into which the law of nations can be divided. *See* Sarah H. Cleveland & William S. Dodge, *Defining and Punishing Offenses Under Treaties*, 124 Yale L. J. 2202, 2212 (2015).  The other three categories were the "necessary," the "conventional," and the "customary."  *Id*. The 'voluntary law of nations' was "based on natural law, but it created external rights and duties."  *Id*.  It was "not 'voluntary' in the modern sense of the word, for nations were obligated to consent to it."  *Id*.  "The 'necessary law of nations' was based directly on natural law."  *Id*.  "It was immutable and binding, but only internally upon the conscience of the sovereign."  *Id*.  Finally, the 'conventional law of nations' consisted of treaties, and the 'customary law of nations' was similar to "today's customary international law," except that "nations were free to withdraw from particular rules."  *Id*.

'voluntary,' the 'customary,' and the 'conventional,' which is to say treaties."  Cleveland &
Dodge, 124 Yale L. J. at 2217.

### C.    The 1988 United Nations Convention against Illicit Traffic in Narcotic Drugs

The United States, as well as scores of other nations, are party to the 1988 United Nations
Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances ("U.N. Drug
Convention"), Dec. 20, 1988, 1582 U.N.T.S. 95.  Parties to the Convention jointly recognize that
the "eradication of illicit traffic is a collective responsibility of all States and that, to that end, co-
ordinated action within the framework of international co-operation is necessary."  *Id*.  They
also declare their determination "to improve international co-operation in the suppression of
illicit traffic by sea."  *Id*.  To that end, a Party is obligated "to establish as criminal offences under
its domestic law, when committed intentionally . . . [t]he possession . . . of any narcotic drug or
psychotropic substance for the purpose of [distribution]."  *Id*., art. 3(1)(a)(iii).  The Party not only
"[s]hall . . . establish its jurisdiction over the offenses" when "committed on board a vessel flying
its flag," but the Party "[m]ay . . . establish its jurisdiction over the offenses" when "committed
on board a vessel concerning which that Party has been authorized to take appropriate action
pursuant to article 17."  *Id*., art. 4(1)(a)(ii), (b)(2).  And, Article 17 of the Convention authorizes
Parties to take appropriate action against a boat "not displaying a flag or marks of registry [that]
is engaged in illicit traffic."  *Id*., art. 17(2).  Article 17 also requires Parties to "co-operate to the
fullest extent possible to suppress illicit traffic by sea, in conformity with the international law
of the sea."  *Id*., art. 17(2).  As a Party to the treaty, these are obligations of the United States.

## V.    Discussion of Congress's Article I power to enact the MDLEA

### A.    The MDLEA defines and punishes offenses under the U.N. Drug Convention

The Court finds that the MDLEA, as applied to defendants, constitutes a proper exercise of Congress's Article I power "[t]o define and punish . . . Offences against the Law of Nations." *See* U.S. Const. art. I, § 8, cl. 10; *see also* Cleveland & Dodge, 124 Yale L. J. at 2273-75 (explaining that the MDLEA is a constitutional enactment under the Offences Clause). As found above, "the most accurate modern translation of the 'law of nations' as used in the Offences Clause into contemporary parlance is . . . 'international law,' which includes both customary international law and treaties." Cleveland & Dodge, 124 Yale L. J. at 2206-07. Thus, as observed above, under controlling Supreme Court precedent, the Offences Clause grants Congress the power to define and punish criminal offenses that proper treaty obligations require the United States "to use due diligence to prevent." *See Arjona*, 120 U.S. at 488.

Articles 3, 4, and 17 of the U.N. Drug Convention require the United States to "co-operate to the fullest extent possible to suppress illicit traffic by sea, in conformity with the international law of the sea." U.N. Drug Convention, art. 17(2). To that end, the Convention authorizes the United States "to establish its jurisdiction over [drug] offenses" when "committed on board a vessel" that is "not displaying a flag or marks of registry." *Id*., arts. 4(1)(b)(2), 17(1). One of the drug offenses that the Convention obligates the United States "to establish as [a] criminal offence under its domestic law, when committed intentionally," is "[t]he possession . . . of any narcotic drug or psychotropic substance for the purpose of [distribution]." *Id*., art. 3(1)(a)(iii). And, for

purposes of the Convention, marihuana is a narcotic drug.  *Id.*, art. 1(n) (defining "narcotic drug"

as "any of the substances . . . in Schedules I and II of the Single Convention on Narcotic Drugs,

1961, as amended by the 1972 Protocol."); Schedule I of the Single Convention on Narcotic

Drugs, Mar. 30, 1961, 520 U.N.T.S. 151, as amended (listing cannabis as a narcotic drug); *Craker*

v. *DEA*, 714 F.3d 17, 20 (1st Cir. 2013) (noting that marihuana is cannabis).  Thus, as a Party to

the Convention, the United States has an international obligation to use due diligence to prevent

and punish the possession of marihuana with intent to distribute on a stateless vessel.

The MDLEA, which prohibits the knowing or intentional possession of marihuana with

intent to distribute on board a vessel without nationality, properly defines and punishes that

U.N. Drug Convention offense.  *See* 46 U.S.C. §§ 70502(c)(1)(A), 70503(a)(1); *see also Bravo*, 489

F.3d at 7-8 (finding that "[t]he extra-territorial jurisdiction authorized in the MDLEA . . . is

supported by numerous international treaties and agreements, including the Single Convention

on Narcotic Drugs . . . and the United Nations Convention Against Illicit Traffic in Narcotic

Drugs and Psychotropic Substances").  Thus, the MDLEA is a constitutional enactment pursuant

to the Offences Clause.  *See, e.g., Arjona*, 120 U.S. at 488.

**B.**   **The Offences Clause is not limited to crimes under customary international law**

Defendants claim, nonetheless, that the MDLEA is not a proper exercise of Congress's

Offences Clause power, but they base that claim on an erroneous interpretation of the term 'Law

of Nations,' as used in the Clause.  *See* **ECF Nos. 38** at 9-11; **39** at 11-13.  According to defendants,

Law of Nations "means customary international law," excluding proper treaty obligations from

its scope.  **ECF No. 38** at 9 (quoting *Bellaizac-Hurtado*, 700 F.3d at 1251).[6]  Thus, defendants argue

that the Clause empowers Congress to punish only "a small subset of crimes . . . 'such as piracy,

slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of

terrorism.'"  *Id.* at 10 (quoting Restatement (Third) of Foreign Relations Law, § 404); **ECF No. 39**

at 11-12 (same).  If defendants' shriveled conception of the term 'Law of Nations' is historically

inaccurate, however, the entire edifice of their opposition to the Offences Clause crumbles.

Defendants' definition of 'Law of Nations' comes from "decisions interpret[ing] the Alien

Tort Statute, instead of the Offences Clause," and it assumes "the Framers understood the term

'the law of nations' in the Offences Clause and the Alien Tort Statute to mean the same thing."

*Bellaizac-Hurtado*, 700 F.3d at 1251.  As Professors Cleveland and Dodge have shown, however,

that baseless assumption is "dangerous" and wrong.  Cleveland & Dodge, 124 Yale L. J. at 2206.

After all, the Alien Tort Statute references 'the law of nations' in contradistinction to – and, thus,

as excluding – 'treaties of the United States,' *see* 28 U.S.C. § 1350, whereas the Offences Clause

does not, *see* U.S. Const. art. I, § 8, cl. 10.  As stated above, the Alien Tort Statute defines the law

---

[6] Professor Eugene Kontorovich has helped spread the erroneous assumption that the term 'law of nations' means the same thing in both the Alien Tort Statute and the Offences Clause.  In *Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction over Drug Crimes*, 93 Minn. L. Rev. 1191 (2009), he writes that "[t]he 'Law of Nations' is generally understood as being the eighteenth- and nineteenth-century term for CIL," *i.e.*, customary international law.  *Id.* at 1224 n.225.  But the only authority Kontorovich cites in support of that broad assertion is the *Flores* decision above.  *See id.*  Although he uses the same sentence from *Flores* that appears in the text above, Kontorovich omits, without indicating he has done so, the *Flores* Court's crucial qualification that the Court was defining 'law of nations' as 'customary international law' only "[i]n the context of the [Alien Tort Statute]."  *See id.*  In his forceful dissent in *United States* v. *Cardales-Luna*, 632 F.3d 731 (1st Cir. 2011), Judge Torruella quotes Kontorovich's misinterpretation of the term 'Law of Nations,' as well as Kontorovich's misleading use of *Flores*, and nothing else to support his thesis that the Offences Clause can only punish crimes under customary international law.  *See id.* at 745 (Torruella, J., dissenting).

of nations atypically, as something akin to customary international law in today's terms. *Flores*, 414 F.3d at 237 n.2. Meanwhile, in general, "[t]he Framers of the Constitution clearly understood the law of nations to include treaties, or what they called 'the conventional law of nations.'" Cleveland & Dodge, 124 Yale L. J. at 2206. Accordingly, as this Opinion and Order has already observed, "the most accurate modern translation of the 'law of nations' as used in the Offences Clause into contemporary parlance is not 'customary international law' but rather 'international law,' which includes both customary international law and treaties." *Id.* at 2206-07.

There is "nothing particularly surprising" about the fact that the Alien Tort Statute uses a different and far narrower meaning of 'law of nations' than the Offences Clause. *Id.* at 2216; *see also Texas Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2520 (2015) (declaring that, in the context of statutory interpretation, "[t]he Court will avoid a reading which renders some words altogether redundant") (quoting *Gustafson* v. *Alloyd Co.*, 513 U.S. 561, 574 (1995)); *FAA* v. *Cooper*, 566 U.S. 284, 300 (2012) (observing that a term can "take[] on different meanings in different contexts"). For example, the term "'[i]nternational law' is sometimes used today in the same way to refer to customary international law in contrast to treaties, despite the fact that 'international law' plainly includes both customary international law and treaties." Cleveland & Dodge, 124 Yale L. J. at 2216; *see, e.g., Rasul* v. *Bush*, 542 U.S. 466, 472 (2004) ("They claimed that denial of these rights violates the Constitution, international law, and treaties of the United States."); *Braniff Airways, Inc.* v. *Nebraska State Bd. of Equalization & Assessment*, 347 U.S. 590, 594-95 (1954) ("The United States of America is declared to possess and exercise

complete and exclusive national sovereignty in the air space above . . . [the waters] over which by international law or treaty or convention the United States exercises national jurisdiction.") (quoting former 49 U.S.C. § 176(a)); *United States* v. *Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936) ("operations of the nation in [foreign] territory must be governed by treaties, international understandings and compacts, and the principles of international law."). Once armed with this historical knowledge, courts may no longer assume erroneously that the term 'law of nations' means the same thing in both the Alien Tort Statute and the Offences Clause.

Indeed, Supreme Court precedent establishes that defendants' narrower understanding of 'law of nations' does not apply to the Offences Clause. Again, defendants state that the phrase 'offences against the law of nations' means only the "small subset of crimes 'recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, war crimes, and perhaps certain acts of terrorism.'" *See* **ECF Nos. 38** at 10 (quoting Restatement (Third) of Foreign Relations Law, § 404); **39** at 11-12 (same). However, in *United States* v. *Arjona*, 120 U.S. 479 (1887), the Supreme Court held that the phrase 'offence against the law of nations,' as used in the Clause, includes any criminal conduct "which the United States are required by their international obligations to use due diligence to prevent." *Id*. at 488.

The *Arjona* Court did not invoke the Offences Clause to uphold a statue prohibiting one of defendants' small subset of crimes, but to uphold a statute enacted "to prevent and punish the counterfeiting within the United States of notes, bonds, and other securities of foreign Governments." *Id*. at 480 (quoting 23 Stat. 22 (1884)). The Court did so based upon the principle

of international law, drawn from de Vattel's The Law of Nations, "that if one nation counterfeits the money of another, or if she allows and protects false coiners who presume to do it, she does that nation an injury." *Id*. at 484. Clearly, in interpreting the Offences Clause, the *Arjona* Court was not using the narrower understanding of the term 'Law of Nations' that defendants suggest, but the broader definition of that term to which this Court subscribes.

This broader definition is essential. Otherwise, the Offences Clause would hardly further our vital national interest in complying with international law. *See Boos*, 485 U.S. at 323.

## VI.    The MDLEA and the requirements of due process

"[T]he Due Process Clause prohibits the Government from 'taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.'" *Beckles* v. *United States*, 137 S. Ct. 886, 892 (2017) (quoting *Johnson* v. *United States*, 135 S. Ct. 2551, 2556 (2015)). "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law.'" *Johnson*, 135 S. Ct. at 2556-57 (quoting *Connally* v. *Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). "To satisfy due process, our application of the MDLEA must not be arbitrary or fundamentally unfair." *Cardales*, 168 F.3d at 553 (citing *United States* v. *Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990)).

The Court finds that the MDLEA satisfies due process, even when applied to conduct lacking a nexus to the United States. "[D]ue process does not require the government to prove a nexus between a defendant's criminal conduct and the United States in a prosecution under

MDLEA," *Angulo-Hernández*, 565 F.3d at 10-11 (quoting *Cardales*, 168 F.3d at 553), as long as applying the MDLEA to the conduct "is consistent with . . . principles of international law," *Cardales*, 168 F.3d at 553 (citing *Davis*, 905 F.2d at 249 n.2). And, as established above, applying the MDLEA to individuals on vessels without nationality is "consistent with" international law. *Matos-Luchi*, 627 F.3d at 6-7; *see also Cuevas-Esquivel*, 905 F.2d at 514; *Victoria*, 876 F.2d at 1010; *Marino-García*, 679 F.2d at 1382-83. Furthermore, "application of the MDLEA to the defendants [here] is [also] consistent with the protective principle of international law because Congress has determined that all drug trafficking aboard vessels threatens our nation's security." *Cardales*, 168 F.3d at 553 (citing *Martínez-Hidalgo*, 993 F.2d at 1056); *see also* 46 U.S.C. § 70501(1).

Defendants cannot complain that the MDLEA "fails to give them adequate *legal* notice," nor that "the circumstances in which the statute applies [to them] are unusual." *United States* v. *Robinson*, 843 F.2d 1, 5 (1st Cir. 1988) (emphasis in original) (construing 21 U.S.C. § 955a (1982), a predecessor statute of the MDLEA). The MDLEA is clear that the possession of drugs with intent to distribute on a vessel without nationality violates United States law. *See* 46 U.S.C. §§ 70502(c)(1), 70503(a)(1). The MDLEA is also clear about how the United States decides whether a vessel is stateless. *See* 46 U.S.C. § 70502(d). Moreover, "Coast Guard stops and 'sweeps' of vessels traveling in the Atlantic or Caribbean en route from South to North America are frequent and routine." *Robinson*, 843 F.2d at 5 (citing H.R. Rep. No. 323, 96th Cong., 1st Sess. 3-4 (1979)); *see also United States* v. *Trinidad*, 839 F.3d 112, 113-14 (1st Cir. 2016) (recounting apprehension of a stateless vessel by U.S. Coast Guard about "80 nautical miles south of Lea Beata, Dominican

Republic.").  Thus, "defendants freely embarked on a course of conduct that they knew could lead to criminal consequences under United States law."  *See Robinson*, 843 F.3d at 5.

Although defendants complain about the method that the United States uses to evaluate a master's verbal claim of his vessel's nationality, *see* **ECF No. 38** at 14-16, that "method is written into the statute and does not affect 'fair notice,'" *Robinson*, 843 F.2d at 6 (citing *United States* v. *Starr*, 27 F. Cas. 1296 (C.C.D. Ark. 1846)).  Also, the method "applies evenhandedly to all ships within its scope . . . , and there is no indication that the Executive has been enforcing th[e] law in any arbitrary way."  *See id*.  Finally, under the MDLEA, a vessel can avoid application of the method by either "flying its nation's ensign or flag" or producing "documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas."  *See* 46 U.S.C. § 70502(e)(1), (e)(2).  Accordingly, the MDLEA plainly "told defendants about the risk of prosecution, and how the decision to prosecute would be made."  *See id*.

Furthermore, defendants cannot claim that they did not know that marihuana possession is illegal because, even if (as Clark suggests) they believed that they were on a Jamaican boat, possessing marihuana is as illegal under the laws of Jamaica as it is under the laws of the United States.  Act of Feb. 28, 1946 (Dangerous Drugs Act of Jamaica), as amended, § 7B(c) (prohibiting the transportation of marihuana with intent to distribute); *see also* Act of Feb. 28, 1998 (Maritime Drug Trafficking Suppression Act of Jamaica), § 21 (extending the application of Jamaican drug laws to offenses committed on Jamaican vessels).  Accordingly, the MDLEA, as applied here, "is not unconstitutional, for, given prior notice and the basic unlawfulness (*i.e.*, under [Jamaican]

law) of [their] primary (drug possessing) conduct, we cannot say, constitutionally speaking, that it is 'unfair' to apply" the statute to defendants. *See Robinson*, 843 F.2d at 7.

The Court finds that applying the MDLEA to defendants is neither arbitrary, nor unfair. *Cardales*, 168 F.3d at 553. Rather, it complies fully with international law and due process. As a result, the Court rejects defendants' claims that the MDLEA violates due process by inviting "arbitrary and unfair" enforcement and by failing to "provide notice to people on the high seas whether the MDLEA will be invoked against them." **ECF Nos. 38** at 14-16; *see also id*. at 19-20.[7]

**VII.    The Government has conclusively proven that defendants' vessel was stateless**

Defendants' final challenge to the Indictment is that the Government "has failed to prove that the[ir] boat is not registered in the claimed nation (Jamaica); therefore, the boat should not be considered stateless under the MDLEA." **ECF No. 38** at 18. However, in its opposition to the motions to dismiss, the Government filed a certification of a designee of the U.S. Secretary of State, which conclusively proves, pursuant to 46 U.S.C. § 70502(d)(2), that the Government of Jamaica has declared that a vessel bearing the "name" and "registration number" of defendants' vessel is not "in the Government of Jamaica's vessel registry." **ECF No. 44-4**, ¶ 4(c). Defendants have not sought to reply to the opposition, nor contest the accuracy of the name and registration

---

[7] The Court also rejects defendants' argument, *see* **ECF No. 39** at 16, that the MDLEA violates the *Ex Post Facto* Clause, *see* U.S. Const. art. I, § 9, cl. 3. It is well-settled that "for a criminal or penal law to be *ex post facto*: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *United States* v. *Robinson*, 843 F.2d 1, 7 (1st Cir. 1988) (quoting *Weaver* v. *Graham*, 450 U.S. 24, 29 (1981)); see also *Lynce* v. *Mathis*, 519 U.S. 433, 441 (1997). The MDLEA, however, "is not 'retrospective'" and it "does not apply to 'events occurring before its enactment'" because "[t]he law was passed before [defendants'] ship left port." *See Robinson*, 843 F.2d at 6-7 (quoting *Weaver*, 450 U.S. at 29).

number that the Government of Jamaica ran through its vessel registry.  Nor have defendants

asserted, in their motions, a different nationality for their vessel.  And, once the Government of

Jamaica had declared that a boat bearing the name and number of defendants' vessel was not in

its vessel registry, it is unclear what further inquiry defendants believe that either Government

should have made.[8]  Accordingly, the Court finds that the United States has conclusively proven

that defendant's vessel was "without nationality" under 46 U.S.C. § 70502(d).  *United States* v.

*Mitchell-Hunter*, 663 F.3d 45, 50 (1st Cir. 2011).  "[A]ny further question about [the] legitimacy

[of the Government's certification] is 'a question of international law that can be raised only by

the foreign nation [invoked].'"  *United States* v. *Cardales-Luna*, 632 F.3d 731, 737 (1st Cir. 2011)

(quoting *United States* v. *Bustos-Useche*, 273 F.3d 622, 627 (5th Cir. 2001)).

## VIII.   Conclusion

In sum, the Court hereby **DENIES** defendants' motion to dismiss.  *See* **ECF Nos. 38**, **39**.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 19th day of July, 2017.

                                                    **S/AIDA M. DELGADO-COLÓN**
                                                    **Chief United States District Judge**

---

[8] Needless to say, the United States Government cannot be faulted for not forwarding, to a verbally-invoked nation, a vessel's name and registration number if the vessel, itself, does not display them.  It appears that this is a case in which the vessel displayed a visible and sufficiently legible name and registration number.